**AFFIDAVIT OF SPECIAL AGENT ELIZABETH KEATING IN SUPPORT OF
CRIMINAL COMPLAINT**

I, Elizabeth Keating, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the with the Criminal Investigation Division of the
Internal Revenue Service ("IRS-CI"). I have been a Special Agent with IRS-CI since October of
2008. Prior to becoming a Special Agent with IRS-CI, I worked as a revenue agent for the Internal
Revenue Service for approximately three years. As a Special Agent my responsibilities include
the investigation of criminal violations of the Internal Revenue laws, the Bank Secrecy Act, the
Money Laundering Control Act, and related offenses.

2.      I am currently investigating PETER BRAND ("BRAND"), JIE "JACK" ZHAO
("ZHAO"), and others for various crimes, including, but not limited to, wire fraud, honest services
wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code,
Sections 1343, 1346 and 1349, respectively; money laundering and conspiracy to commit the
same, in violation of Title 18, United States Code, Sections 1956(a) and 1956(h), respectively; and
federal programs bribery and conspiracy to commit the same, in violation of Title 18, United States
Code, Sections 666 and 371 (collectively, the "Target Offenses").

3.      I make this affidavit in support of a criminal complaint charging BRAND and
ZHAO with conspiracy to commit federal programs bribery, in violation of Title 18, United States
Code, Section 371. As set forth below, I have probable cause to believe that from in and around
2012 through at least 2017, ZHAO and BRAND conspired with each other, and with others known

and unknown, to secure the admission of ZHAO's two sons to Harvard College ("Harvard") as recruited fencers, in exchange for bribes paid to BRAND.[1]

4.      The facts in this affidavit come from my participation in the investigation, including my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A. Relevant Individual and Entities

5.      BRAND and his spouse are residents of Cambridge, Massachusetts, and previously resided in Needham, Massachusetts. From in or about 1999 until in or about July 2019, BRAND was employed as the head coach of men's and women's fencing at Harvard. BRAND was terminated in or about July 2019 for violating Harvard's conflict-of-interest policy. BRAND's spouse has been employed by the City of Cambridge, Massachusetts since in or about 2007.

6.      Co-conspirator 1 ("CC-1") is a resident of Virginia, and the founder of an academy that teaches fencing (the "Academy"). CC-1 is also the founder and president of a charitable entity devoted to fencing (the "fencing charity") that he founded in or about 2007.

7.      ZHAO is a resident of Maryland. He is the chief executive officer of a telecommunications company. ZHAO briefly served as a vice president of the fencing charity in or around 2011.

---

[1] Harvard, which is located in the District of Massachusetts, receives more than $10,000 each year in federal benefits.

8.     ZHAO has two sons.  His older son attended Harvard between approximately 2014 and 2018, and was captain of the men's fencing team.  His younger son matriculated at Harvard in the fall of 2017, and is currently a member of the men's fencing team.  CC-1 served as the fencing coach for ZHAO's two sons when they were in high school.

**B. The Bribery Scheme**

9.     As set forth below, beginning at least in or around 2012, ZHAO, BRAND and CC-1 discussed a scheme pursuant to which BRAND would facilitate the admission of one or both of ZHAO's sons to Harvard by recruiting them to join the men's fencing team in exchange for "financial support" from ZHAO.  The scheme ultimately involved ZHAO contributing $1 million to CC-1's fencing charity, which, in turn, contributed $100,000 to a foundation set up and controlled by BRAND and his spouse.  ZHAO also paid for BRAND's car, made college tuition payments for BRAND's son, paid the mortgage on BRAND's Needham residence, and later purchased the residence for well above its market value, thus allowing BRAND to purchase a more expensive residence in Cambridge.  ZHAO then paid to renovate BRAND's Cambridge home.  In total, ZHAO has made more than $1.5 million in payments to BRAND, or for BRAND's personal benefit.  BRAND did not disclose these payments to Harvard, even as he recruited ZHAO's sons to the Harvard fencing team, thereby helping to ensure their admission to Harvard.

BRAND's Financial Difficulties

10.     As part of my investigation, I have reviewed emails that BRAND and his spouse exchanged using their workplace e-mail accounts.  These emails indicate that, between at least 2009 and 2012, BRAND and his spouse were experiencing financial difficulties.

11.     For example, on or about February 10, 2009, BRAND's spouse wrote to BRAND: "Hi Peter, I still do not think you understand that our bank of America account does not have

overdraft protection and we can barely pay the bills…yesterday you withdrew a total of $122.57.
We did not have the money…lots of bills are pending to be paid on Friday.  I spent my inheritance
money for tuition for ████.  Where are we getting money for summer school, for next year's
tuition, for the electric bill? I am sorry but you cannot use your ATM card whatsoever----if it
happens again we will need to cut your card.  I cut up my ATM card many months ago."

    12.    On or about February 9, 2011, BRAND's spouse emailed BRAND the following:

**From:** ████████████████████████████
**Sent:** Wednesday, February 09, 2011 11:15 AM
**To:** Brand, Peter
**Subject:** STOP. STOP.STOP

Peter,

You used the debit card again yesterday at Sudbury Farms.

STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.
STOP USING THE DEBIT CARD.  NO WITHDRAWALS AND NO PURCHASES.

We are down to $100 in the account until Friday and there may be pending purchases.

    13.    On or about July 12, 2011, BRAND forwarded his spouse information he had
obtained from Harvard about salary advances, noting: "Here is what i can do.  Also, by joining
the CU [credit union] I can borrow up to $25,000 in form of a 5 year personal loan at 10.7%.  Let
me know what you think."

14.     In an email on or about January 4, 2012, BRAND's spouse told BRAND, "We have almost no money in Bank of America and there are bill [sic] pending. Do NOT use atm for ANYTHING."

15.     In an email exchange on or about April 19, 2012, BRAND's spouse forwarded BRAND a job posting with the subject line "part time[.]" BRAND responded: "Can't hold a state job due to pension but I'll apply for a per diem position at Charles River ARC[…] How much do I need to with hold on taxes again?" BRAND's spouse replied: "Not sure but at least $200 per week for federal taxes[.]" BRAND responded: "That's almost half of my monthly paycheck[.]" His spouse then replied: "Ok $150 per week or call our tax guy and ask him. We have owed $6000 extra in taxes each year for the last 10 years. We just maxed out our equity line of credit[.]"

BRAND's Texts with CC-1 Concerning the Admission of ZHAO's Sons to Harvard

16.     In early 2012, ZHAO's older son was a sophomore in high school and an accomplished fencer who trained at CC-1's Academy. According to CC-1, ZHAO wanted his son to attend Harvard but BRAND was initially non-committal about recruiting him to the Harvard fencing team.[2]

17.     On or about May 2, 2012—less than two weeks after BRAND's spouse advised BRAND that they had "maxed out" their equity line of credit—BRAND sent the following text message to CC-1: "Jack doesn't need to take me anywhere and his boys don't have to be great fencers. All I need is a good incentive to recruit them[.] You can tell him that[.]" Based on my

_____

[2] CC-1 was interviewed by the government pursuant to a standard "proffer" agreement, pursuant to which CC-1's statements cannot be used against CC-1 in any proceeding, except in limited circumstances, including if CC-1 is untruthful. CC-1 has not been charged with any crimes, and is providing information to the government in the hope of receiving immunity from prosecution. The information CC-1 has provided has been corroborated by other evidence, including documents, emails, and text messages. As set forth below, CC-1 spent money from the fencing charity on personal expenses.

knowledge of the investigation, I understand BRAND's reference to "Jack" to refer to ZHAO, whose nickname is "Jack".

18.    CC-1 has advised investigators, in sum and substance, that he and ZHAO proposed to BRAND that ZHAO would make a donation to the Harvard fencing program in exchange for BRAND's recruitment of ZHAO's sons to the fencing team. According to CC-1, BRAND rejected that idea and sought an arrangement that would provide him with a personal financial benefit.

19.    For example, in a July 7, 2012 message, CC-1 wrote: "Is there space for[…] your favorite Chinese supporter?" BRAND replied: "Of course as long as Z[h]ao cones [sic] through with the financial support ;)". BRAND added: "He is my no 1 recruit as long as my future us [sic] secured."

20.    Likewise, on or about July 16, 2012, BRAND texted CC-1 to inquire whether he had "spoken to Zhao yet". CC-1 responded: "Off [sic] course call me when u can[.]"

21.    On or about December 4, 2012, ZHAO sent an email to CC-1 telling him that ZHAO's older son had placed second in a fencing tournament. CC-1 forwarded the email to BRAND, who responded confirming that ZHAO's older son would be "my no 1 recruit this coming cycle :)."

22.    According to CC-1, ZHAO and CC-1 ultimately decided that ZHAO would pay $1 million into an escrow account, half of which would be released to CC-1 and paid on to BRAND after ZHAO's older son was admitted to Harvard as a recruited fencer, and the other half of which would be released to CC-1 and paid on to BRAND after ZHAO's younger son was admitted to Harvard as a recruited fencer.

6

23.     On or about January 24, 2013, ZHAO emailed CC-1 an "execution copy" of an "[e]scrow agreement" that had been drafted by an attorney for ZHAO's company.  ZHAO wrote: "[a]s soon as we settle this agreement, I will wire the money to this escrow account."

24.     The escrow agreement drafted by the attorney provided that ZHAO would deliver $1 million to an escrow account, with the attorney acting as the escrow agent.  The agreement provided that the attorney would release $500,000 to CC-1 in the event that ZHAO's older son was admitted to Harvard "on or before December 31, 2015" and that the attorney would release the remaining $500,000 to CC-1 in the event that ZHAO's younger son was admitted to Harvard "on or before December 31, 2019."

25.     The escrow agreement made no reference to BRAND.  However, according to CC-1, ZHAO and CC-1 agreed that CC-1 would forward the money he received from ZHAO to BRAND.

26.     Ultimately, ZHAO and CC-1 did not proceed with the escrow arrangement.  Instead, according to CC-1, they pursued a plan, together with BRAND, whereby ZHAO would purport to make a donation to CC-1's fencing charity, and the fencing charity would thereafter purport to make a donation to a not-for-profit entity that BRAND was planning to establish.

27.     On or about February 19, 2013, ZHAO contributed approximately $1 million to CC-1's fencing charity as a purported donation.  This was, by far, the largest donation the charity ever received.   Between 2009 and 2012, the charity received contributions totaling less than $54,000, and it received no contributions in the two years following ZHAO's payment.

28.     On or about March 5, 2013, CC-1 emailed BRAND, along with two attorneys for the fencing charity: "Gentlemen, Please start a communication about establishing the Foundation."

29.     On or about April 2, 2013, CC-1 again emailed the two attorneys and BRAND, to inquire about the status of setting up "the foundation with Peter Brand in charge."

30.     BRAND and his spouse ultimately established the Peter Brand Foundation in or about May 2013.

31.     That same month, just three months after contributing $1 million to the fencing charity, ZHAO resigned as its vice president, citing his "busy schedule".

32.     On or about October 10, 2013, BRAND sent an email to ZHAO and CC-1.  In the email, BRAND explained that Harvard admissions officers would meet on October 21, and that ZHAO's son should receive a call from Harvard admissions that same night or the next day informing him of the admissions decision.  BRAND wrote in the email that he was "copying this to uncle [CC-1]."

33.     On or about October 20, 2013, CC-1 texted BRAND as follows:  "If u get tickets for the World Series I can pay for it."  BRAND responded: "Baseball us [sic] boring :), but I can use the donation to the foundation after tomorrow. Did you get the information?" CC-1 responded, "Yes sir. Have a meeting on Tuesday. Has to be done the rite [sic] way."

34.     The following day, BRAND received an email informing him that the Harvard admissions committee had deemed ZHAO's older son's admission as "likely."[3]   BRAND forwarded the email to his spouse 21 minutes later, adding: "Good news indeed :)[.]"

35.     BRAND then texted CC-1, "Your man is good to go. Don't say anything to him until he receives the call from admissions."

_____

[3] Harvard informs certain athletic recruits, prior to their formal admission, that their admission is "likely".

8

36.     On or about October 24, 2013, BRAND emailed CC-1 noting that he understood from the fencing charity's lawyer that "donations may not be forthcoming until tax exempt status is in place which can take at least 6 months." CC-1 responded: "Thanks brother. It all good."

37.     BRAND emailed CC-1 again the following day, noting: "I just want to confirm that the contributions total 7.5 Million as we discussed this initially to make sure that all of this is worth my while." In fact, CC-1 has advised investigators that there was no specific agreement for ZHAO to contribute $7.5 million, but that BRAND may have anticipated that amount based upon his understanding that a similar-sized donation that had recently been made to the fencing program at the University of Pennsylvania.

38.     On or about December 13, 2013, ZHAO's older son was officially admitted to Harvard as a member of the class of 2018.

39.     On or about that same day, ZHAO emailed BRAND, attaching his son's Harvard acceptance letter. ZHAO wrote: "Hi Boss...It is official now. I just want to thank you for what you did, really appreciate."

40.     On or about July 2, 2014, the Brand Foundation received tax-exempt status.

41.     On or about July 18, 2014, BRAND's spouse emailed a lawyer for the fencing charity, copying BRAND. BRAND's spouse stated, in sum and substance, that she and BRAND were dissatisfied with the fencing charity's proposed contribution to the Peter Brand Foundation.

42.     On or about October 10, 2014, shortly after ZHAO's older son matriculated at Harvard, the fencing charity contributed $100,000 to the Peter Brand Foundation. The payment was funded by ZHAO's $1 million dollar contribution to the fencing charity.[4]

---

[4] According to the minutes of a meeting of the fencing charity's board of directors held on or about January 9, 2020—following a report in the Boston Globe (the "Globe") about the contribution to the Peter Brand Foundation—"[t]he two transactions were not linked in any way.

43.     Using the money it received from CC-1's charity, the Peter Brand Foundation paid BRAND's spouse $22,000 for serving as a director, and reimbursed her more than $4,000 for various expenses.  The Peter Brand Foundation also spent more than $11,000 on legal fees and donated approximately $71,000 to three other charities: the Cambridge Center for Adult Education, in Cambridge, Massachusetts; the Lake Shore Center for the Arts, in Westfield, New York; and Maccabi USA, a Philadelphia, Pennsylvania-based charity that funds athletic, cultural and educational programs for Jewish youth.  The contribution from the fencing charity was the only money the Peter Brand Foundation received prior to its dissolution in 2016, other than approximately $29,000 that BRAND and his spouse contributed that same year, which effectively reimbursed the foundation for the money it had previously paid BRAND's spouse.

ZHAO's Financial Support of BRAND

44.     As described above, only $100,000 of the $1 million paid by ZHAO to the fencing charity was passed on to the Peter Brand Foundation.  According to CC-1, ZHAO asked CC-1 to return the remaining $900,000 to him, because ZHAO expected that all of the money would be passed on to BRAND.  CC-1 declined to return the money.[5]

45.     Thereafter, ZHAO began making direct payments to BRAND.  For example, on or about June 29, 2015 and July 22, 2015, ZHAO wrote two checks to Penn State University, in the amounts of $6,489.16 and $1,939.50, respectively, to pay for BRAND's son's tuition.  On or about

Mr. Zhao gave the fencing charity the $1,000,000 for the successful completion of his sons' high school fencing careers.  Mr. Zhao had no knowledge of or input into fencing charity's decision to help the Peter Brand Foundation organize and establish itself as a tax-exempt entity."  According to CC-1, however, the minutes are false, as set forth above, because the fencing charity's board was unaware of the deal with BRAND.

[5] Most of the remainder of ZHAO's contribution remains in the fencing charity's brokerage account. As of May 2020, the account had a value of approximately $912,000.  CC-1 improperly used at least $42,000 of the funds in the account to pay for personal expenses, including $31,571.75 for his son's tuition at Harvard.  CC-1 has agreed to repay these expenses.

10

July 30, 2015, ZHAO wrote a check to the Department of Education in the amount of $32,339.92, to pay BRAND's son's educational loans.

46.     Between in or around July 2015 and October 2015, ZHAO made three payments, totaling $119,051.52, to CCO Mortgage Corp., to pay off the mortgage loan on BRAND's Needham residence.

47.     On or about July 30, 2015, ZHAO paid $2,573.45 to the Town of Needham, Massachusetts to pay the water and sewer bill for BRAND's home.

48.     On or about July 30, 2015, ZHAO issued a check in the amount of $34,563.25 to GM Financial.  The check memo stated: "Car loan for Peter Brand".

ZHAO's Purchase of BRAND's Home Prior to His Younger Son's Admission to Harvard

49.     Beginning in the summer of 2016, BRAND helped facilitate the admission of ZHAO's younger son to Harvard as a recruited fencer.  At around the same time, ZHAO made arrangements to purchase BRAND's Needham residence for well above its market value and facilitated BRAND's purchase and renovation of a new residence in Cambridge.  BRAND did not disclose any of the payments he received from ZHAO, or that ZHAO made for his benefit, to Harvard.  BRAND likewise did not disclose to Harvard that he had recruited ZHAO's sons in exchange for money from ZHAO.

50.     For example, on or about March 21, 2016, ZHAO paid $50,000 into an escrow account for the purchase of BRAND's Cambridge condominium.  On or about May 3, 2016, ZHAO closed on the purchase of BRAND's Needham home for $989,500, more than $440,000 above its assessed value. BRAND used the proceeds from the sale to fund his purchase of the Cambridge condominium for $1.3 million, more than $300,000 above the asking price.

11

51.     Because the Needham sale was far in excess of its assessed value, it triggered an on-site inspection from the city assessor.  In his notes, the assessor wrote: "SOLD TO BUYER FROM VIRGINIA FOR $990 K??? PLACE IS VINTAGE 1960'S IN BAD SHAPE??? LIST AS "N" SALE. MAKES NO SENSE."  Records indicate that an "N" sale refers to a non-arm's-length transaction.

52.     On or about June 16, 2016, BRAND emailed ZHAO's younger son that his "goal is to have [his] case presented requesting a likely letter on September 26, (the first likely letter meeting.)"

53.     On or about June 24, 2016, BRAND emailed an Associate Director of Harvard Athletics, stating that he had offered recruiting slots to ZHAO's younger son and four other prospective students.

54.     On or about June 25, 2016, ZHAO's younger son emailed BRAND his personal statement in support of his application.

55.     On or about September 13, 2016, BRAND emailed the above-mentioned athletic director and a Harvard admissions officer, noting that he wanted ZHAO's younger son and another candidate to be reviewed at the September 20, 2016 "likely letter" meeting.  Attached to the email was an "Individual Rating Form" (IRF), which classified ZHAO's younger son as a recruited athlete for men's fencing.

56.     On or about September 20, 2016, BRAND emailed a senior Harvard admissions officer to inquire, among other things, whether Harvard had made a decision about ZHAO's younger son's admission.  The admissions officer responded, with respect to ZHAO's younger son and another candidate: "we did review those two already and it looks good for both."

12

57.    On or about September 29, 2016, ZHAO's younger son received a "likely" letter from Harvard.  Two days later, ZHAO's younger son emailed BRAND that he had received the likely letter.  BRAND forwarded the email to his spouse, stating, "Here it is."

58.    Between August 19, 2016 and April 11, 2017—during the period that ZHAO's younger son's Harvard application was pending, and following his admission as a recruited fencer—ZHAO paid for at least $154,626.41 in renovations to BRAND's Cambridge condominium, making the payments directly to BRAND's contractor.[6]   For example, approximately one week after ZHAO's younger son received his likely letter on or about September 29, 2016, ZHAO paid the contractor $24,314.93.  Memos on the cancelled checks indicate that they were for BRAND's condominium.

59.    On or about July 30, 2017, ZHAO listed the Needham residence for sale for $699,000, approximately $290,000 less than he had paid for the house just one year earlier.  ZHAO ultimately sold the residence for $665,000, incurring a loss of approximately $324,500.

BRAND's Termination by Harvard and ZHAO's Meeting with CC-1

60.    Beginning in or about April 2019, the Globe published a series of articles concerning the admission of ZHAO's sons to Harvard as recruited fencers, and ZHAO's purchase of BRAND's Needham home.  The Globe quoted ZHAO as saying, in substance, that he had purchased BRAND's Needham residence as an "investment," despite the fact that he never rented the house or otherwise obtained any income from the property, and sold it at a loss the following year.  ZHAO also told the Globe that he wanted to improve BRAND's quality of life, because he had heard BRAND complain about his lengthy commute from Needham to Cambridge.  ZHAO

---

[6] ZHAO's company paid for approximately $39,794.09 of the renovations.

stated he did not check the market value of the Needham home, and that the price was set by BRAND.

61.    According to CC-1, shortly after the first Globe article was published, ZHAO arranged to meet with CC-1 in the parking lot of CC-1's fencing academy in Virginia. CC-1 advised investigators that, during the meeting, ZHAO attempted to explain why he had purchased BRAND's home in Needham, but CC-1 told ZHAO that he did not want to know what had happened with the house purchase. When ZHAO asked what they would say about the $1 million purported donation to CC-1's fencing charity, CC-1 told ZHAO "it was a donation" even though both knew that they had agreed that the money would be passed on to BRAND.

62.    Harvard ultimately terminated BRAND for violating Harvard's conflict of interest policy.

## CONCLUSION

63.    Based on the facts as set forth in this affidavit, I have probable cause to believe and I do believe that ZHAO and BRAND conspired with each other, and with others known and unknown, to commit federal programs bribery, in violation of Title 18, United States Code, Section 371.

Respectfully submitted,

Elizabeth Keating, Special Agent
Internal Revenue Service

Subscribed and sworn to me telephonically

on _____ November 13, 2020

HONORABLE JENNIFER C. BOAL
United States Magistrate Judge



14